Irving LAKER, Plaintiff,

v.

William FREID, Defendant.

No. CA–93–11993–PBS.

United States District Court,
D. Massachusetts.

June 10, 1994.

Joan A. Lukey, William H. Paine, Hale & Dorr, Boston MA, David J. Hensler, Jonathan A. Constine, Hogan & Hartson, Washington DC, for plaintiff.

Michael Walsh, Douglas S. Brown, Choate, Hall & Stewart, Boston MA, for defendant.

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SARIS, District Judge.

The plaintiff, Irving Laker, has brought this eleven count complaint against the defendant, William Freid, seeking recovery under federal securities laws, the civil Racketeer Influenced and Corrupt Organizations Act (RICO), the Massachusetts Consumer Protection Act, and assorted common law theories. The complaint essentially alleges that the defendant, through a series of fraudulent misrepresentations and omissions, induced the plaintiff to invest over $3,000,000 in loan participations that are now worthless. The defendant has moved to dismiss all eleven counts of the plaintiff's complaint. For the reasons set forth below, the defendant's motion is **DENIED.**

### BACKGROUND

For purposes of this motion, this court accepts as true the allegations contained in the plaintiff's second amended complaint, which are set forth below.

In late 1989, Freid proposed that the plaintiff participate in loans that Freid was making to Charles, Sylvia, John, and Elaine Brennick ("the Brennicks") for use in the

Brennicks' business enterprises. The Brennicks operated businesses involved in the care or treatment of persons suffering from severe head injury traumas. By funding a portion of Freid's loans, Laker would obtain rights to a proportionate interest in profits generated by those loans.

On November 23, 1989, in Boston, the defendant made a series of misrepresentations to Laker concerning the creditworthiness of the Brennicks and the health of their business. Freid told Laker that: the Brennicks' businesses generated hundreds of thousands of dollars per month in cash flow, which was more than sufficient to repay the principal and interest on the loans; the loan participations would be profitable; the Brennicks always paid what they owed; Charles Brennick had gone bankrupt once before, but everyone got paid except the banks; Freid had brought multiple investors in on those loan participations and everyone always got paid; Freid could always get Laker's money back on short notice from other investors; Freid was also investing his own money; and Freid had obtained collateral for the loans. Freid repeated these representations to Laker in Florida during the week of December 25, 1989.

In reality, the complaint alleges, as a long time friend of the Brennicks, the defendant knew or should have known that their businesses: were conducted through a pattern of illegality and fraud; had engaged in a pattern of negligent treatment of patients; had been the subject of a New York Grand Jury investigation in 1975; and were currently experiencing severe legal and financial problems due to pre-existing debt, insurance fraud, and inadequate patient care. Moreover, Freid was actually not investing his own funds in each transaction, and had not obtained collateral for the loans. Freid also concealed or failed to disclose that he would be receiving 6 percent to 12 percent from the Brennicks for arranging the loans. None of this information was disclosed to the plaintiff.

On June 5, 1992, Freid mailed a "Dear Investor" letter to Laker which stated that the publicity surrounding Charles Brennick and his business, New Medico Associates, Inc., "appears to have no basis in fact" but had hurt its image. Freid did not disclose the true nature of the financial and legal difficulties.

In reliance on these misrepresentations and omissions, Laker ultimately purchased over $3,000,000 in loan participations. The investments were made in a series of approximately nine transactions between January, 1990 and December, 1992: $200,000 on January 17, 1990; $50,000 on February 20, 1990; $200,000 on August 28, 1990; $200,000 on November 14, 1990; $400,000 on July 2, 1991; $500,000 on November 1, 1991; $500,000 on or about January 29, 1992; $500,000 on or about October 1, 1992; $500,000 on or about November 16, 1992. In each transaction, within a few days after a telephone conversation between Freid in Massachusetts and Florida, and Laker in Michigan, in which the misrepresentations were repeated or reaffirmed, the plaintiff would mail or wire money to Freid. Freid would then make the loan to the Brennicks, and send a letter to Laker describing the loan which Freid had just made and requesting Laker's written assent. The Brennicks executed at least five promissory notes in connection with the loans, providing for repayment of the funds to Freid. The notes were made by different Brennicks and upon different terms. The loan participations are currently worthless.

On February 8, 1993, John and Elaine Brennick filed for Chapter 11 Bankruptcy. Charles and Sylvia Brennick also are unable to repay their debt. Collectively, the Brennicks have defaulted on all the loans in which Laker purchased loan participations.

In the present suit, the plaintiff seeks recovery of all funds transferred from him to the defendant, together with multiple damages and attorney's fees and costs. The second amended complaint asserts 11 causes of action, as follows: I—Federal Securities Fraud for violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and S.E.C. Rule 10b–5, 17 C.F.R. § 240; II—Federal Securities Fraud for violations of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77l (2); III—RICO violations, 18 U.S.C. § 1964(c); IV—Massachusetts Uniform Securities Act violations, Mass. Gen.L. ch. 110A, § 410(a); V—Breach of Fi-

duciary Duty; VI—Breach of Contract; VII—Fraudulent Misrepresentation; VIII—Negligent Misrepresentation; IX—Fraud; X—Negligence; XI—Mass.Gen.L. ch. 93A violations. The defendant has moved to dismiss the complaint in its entirety for the reasons discussed below.

## DISCUSSION

### I. *Motion to Dismiss Pursuant to Fed. R.Civ.P. 12(b)(6)*

The defendant has moved to dismiss certain of the plaintiff's claims pursuant to Fed. R.Civ.P. 12(b)(6) for failure to state a claim. The standard for dismissal under Fed. R.Civ.P. 12(b)(6) is clear: a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The court must accept the factual averments of the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *Coyne v. City of Somerville*, 972 F.2d 440, 442–43 (1st Cir.1992).

### A. *Statute of Frauds*

■ The defendant has moved to dismiss Counts IV through XI on the ground that under the statute of frauds the alleged misrepresentations were required to be in writing. The defendant relies on Mass.Gen.L. ch. 259, § 4 (1992), which provides as follows:

No action shall be brought to charge a person upon or by reason of a representation or assurance made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance is made in writing and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized.

In an unbroken line of cases dating back to 1904, courts have stated that the statute "must be limited to representations made to induce the plaintiff to enter into a transaction *which will result in a debt due to the plaintiff from the third person* ...." *Walker v.*

*Russell*, 186 Mass. 69, 73, 71 N.E. 86 (1904) (statute not applicable to equity investments) (emphasis added). In a thorough historical review, the *Walker* court traced the statute back to the British act after which it was modeled, Lord Tenterden's act, passed in 1828. (9 Geo. IV, c. XIV, par. VI). The enactment of Lord Tenterden's act was motivated by Parliament's concern with the injustice that might result "from allowing a disappointed creditor to charge a defendant *with the debt due him from a third person* by parol testimony of a fraudulent representation as to the solvency of that third person...." *Walker*, 186 Mass. at 71, 71 N.E. 86 (emphasis added). "The typical case which the Legislature had in mind in enacting [the predecessor statute] was the case where the plaintiff is induced to extend a credit to the third person by representations made by the defendant as to his 'character, conduct, credit, ability, trade or dealings.'" *Id.* at 71, 71 N.E. 86. An example is where the plaintiff is induced by representations of defendant to endorse the note of a third person for the third person's accommodation, because there, the plaintiff is induced to extend a credit to the third person. *Id.* at 72, 71 N.E. 86.

The *Walker* court concluded that while the statute does apply "to representations made to induce the plaintiff to enter into a transaction which will result in a debt due to the plaintiff from the third person," it does not apply to "representations as to the financial credit of the corporation, made to induce a plaintiff to subscribe to the shares of the corporation...." 186 Mass. at 73, 71 N.E. 86. *See also Middlesex County Nat'l Bank v. Redd Auto Sales, Inc.*, 336 Mass. 727, 730–31, 147 N.E.2d 790 (1958) (cites *Walker* for the principal that the statute applies to representations made to induce plaintiff to enter a transaction resulting in a debt due to plaintiff from third person); *Cauman v. Biggar*, 251 Mass. 91, 93, 146 N.E. 230 (1925) (same); *Huntress v. Blodgett*, 206 Mass. 318, 324, 92 N.E. 427 (1910) (same).

A fair reading of the complaint compels the conclusion that, if the transactions are fairly characterized as debt, rather than eq-

uity,[1] then the debt incurred by the Brennicks, the third party in this case, is owed to the defendant rather than the plaintiff. For instance, the series of promissory notes executed by the Brennicks are each made payable to Freid rather than Laker. At the very least, the complaint alleges that in this loan participation agreement borrowers incurred no debt to plaintiff, and defendant concedes that in the "typical loan participations" there is "no legal relationship between the participant and the borrower." The cases cited by the defendant are unavailing in that they deal with plaintiffs trying to recover from defendants who induced them to extend credit directly to third parties. *See Keene Lumber Co. v. Leventhal,* 165 F.2d 815, 819–21 (1st Cir.1948); *Emery Corp. v. Century Bancorp.,* 588 F.Supp. 15, 16–17 (D.Mass.1984); *Middlesex County Nat'l Bank,* 336 Mass. at 728, 147 N.E.2d 790. Accordingly, the statute does not apply to the facts of this case.

■ The defendant's suggestion that there actually is a legal relationship between the borrowers and the plaintiff, based on the theory that Freid was merely acting as an agent for Laker, is also unpersuasive. The second amended complaint (¶ 26) alleges: "Laker and Freid agreed that Laker would transmit funds to Freid and that Freid would be responsible for acting as Laker's agent in investing Laker's funds in the loan participations." Reading the complaint in the light most favorable to the plaintiff, the complaint alleges that Freid acted as an agent in investing Laker's money in loan participations, not as an agent in making a loan directly from Laker to the Brennicks. Indeed, in the Brennicks' bankruptcy case, Freid, and not Laker, is listed as one of John and Elaine Brennicks' twenty largest unsecured creditors.

### B. Breach of Fiduciary Duty

■ The defendant moves to dismiss Count V of the complaint for failure to allege facts that would support a claim for Breach of Fiduciary Duty. There is no precise, comprehensive definition of circumstances that give rise to a fiduciary relationship. *Savoy v. White,* 139 F.R.D. 265, 267–68 (D.Mass. 1991); *Broomfield v. Kosow,* 349 Mass. 749, 756, 212 N.E.2d 556 (1965). In general, one of the hallmarks of a fiduciary relationship is the plaintiff's reposing of trust and confidence in the defendant, and the defendant's knowledge of the plaintiff's reliance upon him. *Broomfield,* 349 Mass. at 755, 212 N.E.2d 556. Key factors to consider include "the relation of the parties prior to the incidents complained of, the plaintiff's business capacity or lack of it contrasted with the defendant, and the readiness of the plaintiff to follow the defendant's guidance in complicated transactions wherein the defendant has specialized knowledge." *Id.*

■ Applying these factors, and bearing in mind that "[t]he existence of a fiduciary relationship is generally a factual determination," *Savoy,* 139 F.R.D. at 267, the court denies the defendant's motion to dismiss this count. A fair reading of the complaint indicates the following: the plaintiff placed complete faith in the defendant's abilities and representations, and, as Laker specifically alleges in paragraph 77, he "reposed trust in Freid's ability to diligently and competently represent his interests and transmitted funds to Freid with the understanding that with respect to these transactions Freid was his fiduciary."; the defendant knew of Laker's reliance upon him and told Laker "[y]ou're family, I'll take care of you."; Freid exercised control over the investment, management, and disposition of Laker's funds; and the defendant, as a longtime friend and associate of the Brennicks, had specialized knowledge concerning their creditworthiness and the health of their businesses.

Additionally, as indicated above, paragraph 76 alleges that Laker and Freid agreed "that Freid would be responsible for acting as Laker's agent in investing Laker's funds in the loan participations." *See Frontier Management Co., Inc. v. Balboa Ins. Co.,* 658 F.Supp. 987, 990 (D.Mass.1986) ("[I]f one of the parties is an agent of the other, the agent

---

**1.** For purposes of this motion, the court need not determine whether the transactions described in the complaint are debt or equity transactions.

As *Walker* provides, and defendant concedes, the statute does not apply to equity transactions.

will be a fiduciary with respect to all matters within the scope of his agency.").

### C. RICO

Count III of the complaint is brought pursuant to 18 U.S.C. § 1964(c) (1988), the Racketeer Influenced and Corrupt Organizations Act. The plaintiff asserts a cause of action under 18 U.S.C. § 1962(c) (1988)[2], which provides as follows:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The defendant's motion to dismiss count III centers on whether the plaintiff has alleged sufficient facts to show "a pattern of racketeering activity."

Under the statute, " 'a pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5) (1988). These "acts of racketeering activity," referred to as "predicate acts," are acts indictable under any one or more of certain criminal laws enumerated in § 1961(1). Included in this list are the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, and securities fraud.

■ As many courts have noted, by use of the language "requires at least," section 1961(5) "does not so much define a pattern of racketeering activity as state a minimum necessary condition for the existence of such a pattern." *H.J. Inc., v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) ("H.J."). The Supreme Court, relying on the legislative history of the statute for guidance in its attempt to define the term "pattern of racketeering activity," has concluded that to prove

such a pattern "a plaintiff or prosecutor must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *Id.* at 239, 109 S.Ct. at 2900.

The first of these two elements, relatedness, is not seriously contested by the defendant. Predicate acts are related if they "embrace[ ] criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e)). Applying this standard, the acts of mail and wire fraud as well as securities violations alleged by the plaintiff are all clearly related by the common goal of fraudulently inducing the plaintiff to lend money to the Brennicks, and similar methods of commission.

■ The second requirement, that the predicate acts "amount to or pose a threat of continued criminal activity," is the more hotly contested. The Court breaks this requirement down into two possibilities: " 'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. The open-ended concept of continuity does not apply to the facts of this case, as there is no allegation of a "threat of continued racketeering activity." The Brennicks are in bankruptcy and the only alleged victim, the plaintiff, will apparently no longer be relying on any representations made by the defendant. *Cf. H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902 (as an example of the threat of continued racketeering activity, the Court gives the example of a hoodlum who tells neighborhood storekeepers that he will "insure" them from broken windows, and will return to their store each month to collect the "premium" on their "coverage").

It is only the closed-ended concept of continuity that is at issue in the motion to dismiss Count III. "A party alleging a

---

**2.** The plaintiff's second amended complaint fails to identify the subsection of § 1962 under which it is being brought. In his brief, the plaintiff refers to § 1962(c). Under any subsection of § 1962, the plaintiff is required to demonstrate a "pattern of racketeering activity."

RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. "Too few acts would suggest that the defendants were engaged in only 'sporadic activity,' ... and too short a period of time would suggest that defendants were not engaged in 'long-term criminal conduct.'" *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 447 (1st Cir.1990) (a plaintiff who alleges a high number of related predicate acts committed over a substantial period of time establishes that those acts amount to continued criminal activity).

In the present case, the period of time over which the predicate acts occurred is approximately 3 years and 1 month, from November, 1989 to December, 1992. The parties dispute the proper calculation of the number of predicate acts. The plaintiff, citing to paragraphs 9, 16, and 18–31 of the complaint, contends there are 40 predicate acts: "21 instances of mail fraud and 10 separate instances of wire fraud, occurring in 9 fraudulent securities transactions...." The defendant contends there are only 11 predicate acts: one instance of mail fraud and 10 of wire fraud. According to the defendant's calculation, the nine securities transactions should not be counted because, as the defendant phrases it, the plaintiff "mixes apples and oranges when he adds his version of the number of fraudulent transactions alleged (i.e., nine) to his version of the number of predicate acts (i.e. 31)." Additionally, the defendant counts only 15 instances of mail fraud, and suggests that 14 of them, in which the plaintiff mailed checks to the defendant and the defendant mailed confirmation letters, shouldn't count because they are "innocuous" and "routine." Defendant contends that only the "Dear Investor" letter could be deemed a predicate act of mail fraud. However, it was precisely through these mailings that the defendant was able to perpetrate his alleged schemes to defraud. *See Center Cadillac v. Bank Leumi Trust Co.,* 808 F.Supp. 213, 228 (S.D.N.Y.1992) (citing *Schmuck v. United States,* 489 U.S. 705, 710–715, 109 S.Ct. 1443, 1447–1450, 103 L.Ed.2d 734 (1989) ("The mailings themselves need not contain misrepresentations, nor must they contribute directly to the deception of the plaintiffs.... Even mailings which are 'innocent' or routine when viewed in isolation, may still satisfy the mailing element under the mail fraud statute where the mailing is part of the execution of the scheme as conceived by the perpetrators at the time.").

While the defendant points out that "[c]ourts are particularly reluctant to rely over much on mail fraud predicates to establish a RICO pattern," *Trundy v. Strumsky,* 729 F.Supp. 178, 184 (D.Mass.), *vacated,* 915 F.2d 1557 (1st Cir.1990), such reluctance is absent in the present case, where use of the mails was instrumental to the perpetration of the alleged fraud. *Contrast Feinstein v. Resolution Trust Corp.,* 942 F.2d 34, 46 (1st Cir.1991) (certain mailings could not be considered separate fraudulent actions for the sake of establishing a pattern, in part because there was no assertion that the mailings "comprised a means by which the fraudulent scheme was perpetrated, or served to perpetuate or conceal the fraud"); *Trundy,* 729 F.Supp at 184 ("[the] alleged mail fraud does not add much" because "the use of the mails was incidental to the actual fraud....").

While defendant concedes that the complaint alleges 10 instances of wire fraud, defendant urges the court not to count the nine separate investments made by the plaintiff, each constituting securities fraud. The question was raised at oral argument whether it would be improper to treat these investments as nine additional predicate acts, on the theory that it would constitute "double counting" of the mail and wire fraud. This theory finds support in cases holding that a single action that violates two statutes should not constitute two predicate acts under RICO. *United States v. Walgren,* 885 F.2d 1417, 1425–26 (9th Cir.1989); *United States v. Kragness,* 830 F.2d 842, 861 (8th Cir.1987). Arguably, because the alleged securities violations are based in large part on oral misrepresentations that were made in person, on two separate occasions, it may be appropriate to treat the two oral misrepresentations as two distinct predicate acts of securities fraud. The courts have "consistently held that a

single episode does not constitute a 'pattern,' even if that single episode involves behavior that amounts to several crimes (for example, several unlawful mailings)." *Apparel Art Intern., Inc. v. Jacobson,* 967 F.2d 720, 723 (1st Cir.1992). In *Apparel Art,* the First Circuit imagined cases "in which it is difficult to say whether several instances of criminal conduct are but parts of a single criminal instance or episode, or constitute several episodes making up a 'pattern' (say, several minor frauds designed to raise money in order to finance an effort to rob Fort Knox)." *Id.*

Even if this court were to consider only the 10 alleged instances of wire fraud and 15 instances of mail fraud, without "double counting" the nine separate investment transactions, the complaint alleges a sufficient degree of continuity over a substantial period of time to withstand a motion to dismiss. *Compare, e.g., A.I. Credit Corp. v. Hartford Computer Group, Inc.,* 847 F.Supp. 588 (N.D.Ill.1994) (RICO claim survives motion to dismiss where, over 13 month period, defendant fraudulently induced four plaintiffs to make a combined total of four loans to two third-party corporations); *Zee–Bar Inc.– N.H. v. Kaplan,* 792 F.Supp. 895, 907 (D.N.H.1992) (25 acts of mail fraud over 23 months suggests "more than 'sporadic' criminal activity ... and over a period of time long enough to suggest 'long-term criminal conduct'"); *Healey v. Pyle,* 1992 W.L. 80775 at 7 (S.D.N.Y. March 31, 1992) (38 instances of mail and wire fraud over 4 years, done by one perpetrator against one victim as part of one scheme, is sufficient); *with Lincoln House, Inc. v. Dupre,* 903 F.2d 845, 846–47 (1st Cir.1990) (six acts of mail fraud, four of which are in connection with an allegedly fraudulent divorce, over 26 months suggests only sporadic criminal activity); *Framingham Union Hosp., Inc. v. Travelers Ins. Co.,* 721 F.Supp. 1478, 1485 (D.Mass.1989) (no RICO pattern where activity spread out over 7 years, involved several wrongdoers, and its focus was a single bundle of insurance policies, albeit renewed and converted). A period of 37 months is sufficiently lengthy to be considered "long-term criminal conduct." *H.J.,* 492 U.S. at 242, 109 S.Ct. at 2902.

Alternatively, if this court were to treat each of the separate transactions as a single episode, consisting of several crimes each (e.g., two mail and a wire fraud), the complaint still alleges nine distinct episodes consisting of separate investment transactions which occurred throughout the 37 months, with a regularity, pacing and commonality of method to suggest more than just "sporadic" activity. While the episodes are sufficiently related, they are also sufficiently spaced apart and distinctive (i.e., different amounts of money, different loan participation terms) so as not to constitute a single criminal episode. Regardless of which counting approach the court takes, the RICO count survives.

## II. *Motion to Dismiss Pursuant to Fed. R.Civ.P. 9(b)*

■ The defendant has moved to dismiss Counts I–IV, VII, and IX for failure to plead fraud with sufficient particularity pursuant to Fed.R.Civ.P. 9(b). Rule 9(b) provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." "The clear weight of authority is that Rule 9 requires specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *McGinty v. Beranger Volkswagen, Inc.,* 633 F.2d 226 (1st Cir.1980). The particularity requirement serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987).

■ This court concludes that the plaintiff has adequately specified the time, place, and content of the seven specific misrepresentations alleged in paragraph 36. The content of these representations is that: Freid was investing his own funds in each transaction;

Freid had obtained certain collateral for the loans; the principal invested in the loan participations would be returned to Laker; the loan participations would be profitable; the enterprises owned or controlled by the Brennicks were legitimate and reputable; the enterprises owned or controlled by the Brennicks were profitable; and the loans to the Brennicks would be repaid, on short notice, if necessary, by other investors. The complaint indicates that each of these statements was made by Freid to Laker, in Boston, Massachusetts, on or about November 23, 1989, and were repeated in Florida during the week of December 25, 1989, and in at least nine separate telephone conversations preceding each of the transactions. Additionally, the complaint adequately states the time, place, and content of the alleged instances of mail and wire fraud. *See New England Data Services*, 829 F.2d at 291.

■ The defendant advances several arguments in support of his motion. First, the defendant notes that paragraph 36 of the complaint begins "As set forth in paragraphs 8 through 16 above, Freid made the following false and misleading representations, among others, in connection with sale of the loan participations," and then goes on to list the seven specific alleged misrepresentations listed above. Defendant argues that by use of the term "among others," the plaintiff has alleged unidentified misrepresentations without providing any sort of particularity as to their time, place, and content. Accordingly, the defendant contends, all fraud based counts should be dismissed because "[t]o satisfy Rule 9(b), a pleading must specify the time, place and content of *each* alleged false representation." *Bio–Vita, Ltd. v. Rausch*, 759 F.Supp. 33, 37 (D.Mass.1991) (emphasis added). The weakness in this argument is that while inadequately pled allegations of fraud will be dismissed, those allegations of fraud that are pled with sufficient particularity can still survive the motion. *See, e.g., Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357 (1st Cir.1994). Accordingly, these counts may proceed based on the allegations that are well pled.

■ The defendant also argues that the complaint does not adequately allege that the defendant knew of the falsity of the representations, and that the plaintiff has presented a case of "fraud by hindsight." This court disagrees. A complaint is inadequate if it makes merely a "general averment of the defendant's 'knowledge' of material falsity, unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir.1992). *See also DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.) ("Although Rule 9(b) does not require 'particularity' with respect to the defendants' mental state, the complaint still must afford a basis for believing that plaintiffs could prove scienter."), *cert. denied*, 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). The allegation that the defendant was a longtime friend and associate of the Brennicks makes it "reasonable to believe" that he knew his statements were misleading. *See Greenstone*, 975 F.2d at 25. Indeed, some of the alleged misrepresentations on which Laker relied, such as Freid's statement that he was investing his own funds in each transaction and had obtained certain collateral for the loans, were plainly within his knowledge.

Additionally, the complaint alleges numerous specific facts that suggest the representations concerning the future profitability of the investments were false when made. *See Steiner v. Unitrode Corp.*, 834 F.Supp. 40, 43 (D.Mass.1993) ("Plaintiff must identify facts or circumstances showing that the alleged misrepresentations were false when made, and not merely proven wrong in hindsight."). For example, according to the complaint, at the time the defendant's representations were made, the Brennicks and their businesses: induced patients to use their head-trauma centers through false representations to patients and doctors; neglected patients by failing to provide proper therapy and hygiene; had been the subject of a New York Grand Jury investigation in 1975; and were experiencing severe financial and legal problems due to complaints, investigations, and lawsuits relating to insurance fraud and substandard patient care. In short, because the complaint identifies circumstances that

show the alleged misrepresentations were false when made, this case falls outside the realm of "fraud by hindsight." *See Greenstone*, 975 F.2d at 26–27 (dismissing allegation that an eventual lawsuit gave rise to an inference of earlier knowledge that such a lawsuit was likely); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 877–79 (1st Cir.1991) (dismissing allegation that eventual poor performance gave rise to an inference of earlier knowledge that such later performance was likely); *Berliner v. Lotus Development Corp.*, 783 F.Supp. 708, 710 (D.Mass. 1992); *Slavin v. Morgan Stanley & Co., Inc.*, 791 F.Supp. 327, 333 (D.Mass.1992).

### ORDER

For the foregoing reasons, it is hereby **ORDERED** that the defendant's motion to dismiss be **DENIED**.