**ORTHO PHARMACEUTICAL CORPORATION and Johnson & Johnson (Hong Kong) Ltd., Plaintiffs,**

v.

**SONA DISTRIBUTORS, INC. and Elmcrest Trading, Ltd., Defendants.**

**No. 86–32–CIV.**

United States District Court, S.D. Florida, Miami Division.

June 22, 1987.

William Wallace, III, Howrey & Simon, Washington, D.C., Benedict P. Kuehne, Sonnett, Sale & Kuehne, Miami, Fla., for plaintiffs.

Edward Joffee, Ellen Rubin, Sandler & Travis, Miami, Fla., for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING JUDGMENT IN FAVOR OF PLAINTIFFS

SPELLMAN, District Judge.

This action is based on common law fraud and statutory theft. Ortho Pharmaceutical Corp. and Johnson & Johnson (J & J) (Hong Kong), both wholly-owned subsidiaries of J & J, brought this case against Sona Distributors, Inc., headquartered in Louisville, Kentucky, and Elmcrest Trading, Ltd., Hong Kong, both companies owned and operated by the Chawla brothers. Essentially, the Plaintiffs contend that the Defendants conspired with a Mr. Y.L. Lin of Chung Ching Dispensary, Ltd. of Hong Kong, to obtain American manufactured pharmaceuticals in Hong Kong at less than American wholesale prices. Plaintiffs alleged that Mr. Lin obtained these goods by falsely representing that these pharmaceuticals were purchased for resale in the Peoples Republic of China. In fact, these purchases were intended for resale in the United States, and did so enter the American pharmaceutical market, competing against identical products that were purchased from J & J at considerably higher prices. The following constitute this Court's Findings of Fact and Conclusions of Law.

In mid–1984, Inder Chawla approached Y.L. Lin of Chung Ching Dispensary with a request to purchase American manufactured pharmaceutical products for export to the United States. Mr. David Sahni, a vice-president of Sona and a Director of Elmcrest, also met with Mr. Lin in September 1984. On a separate occasion, Kulraj Chawla, the President of Sona met with Lin as well. The Defendants wished to purchase Retin-A Cream, Retin-A Gel, Parafon Forte and Tolectin. In September 1984, Lin met with Ms. Lillienne Yeung of J & J (Hong Kong). Lin told Yeung that he wanted to purchase Retin-A on behalf of a customer for resale to China, but that he would not disclose his customer's name. Yeung believed Lin's representations because Chung Ching had an over twenty year relationship as a distributor of J & J products. Lin insisted, however, that the products remain in their original American packaging on the theory that pharmaceuticals labeled in English are considered by foreign countries to be more reliable due to heightened regulatory activity in the United States.

J & J had never before made these products available to anyone other than hospitals and doctors. Pharmacists and wholesalers in Hong Kong could not get these products at any price. J & J made an exception in this instance only because of the false prospect of opening a new and highly lucrative market in China. Between December 1984 and October 1985, the Defendants purchased 24,720 tubes of Retin-A Gel and 23,040 tubes of Retin-A Creme. These purchases were then resold by Sona to a company in California known as P.D.I., Inc. Plaintiffs have calculated their damages based on the benefit of the bargain

formula; meaning that they hope to receive the difference between the fraud-induced price and the price they would have received absent the fraud. Using this calculus, the amount of the loss for Retin-A is $200,290.30. During this same period, the Defendants purchased 5,760 bottles of Parafon Forte and 5,760 bottles of Tolectin. Each bottle had a distinctive red dot. It was later discovered that these red dots were obliterated. The Defendants once again resold these products to P.D.I., Inc., and the amount of the loss for these products amounted to $88,160.77. When the Plaintiffs finally discovered this fraudulent scheme, they abandoned further shipments and were forced to destroy some products that were returned to the U.S. The cost was $35,194.00, including $1,612.24 for transportation. Moreover, the Plaintiffs incurred actual costs of $11,668.93 for investigating and uncovering this fraud.

Unfortunately, the evidence at trial revealed that this was not an isolated instance of fraud. In January 1984, Doulatram, one of Sona's Hong Kong suppliers, told Inder Chawla that it was able to obtain a ten percent discount off the price of Aristocort, another American manufactured pharmaceutical, by falsely representing that it was intended for resale to China. Sona ultimately participated in this scheme. Even in September 1983, Sona instructed Doulatram not to inform the manufacturer of Enduron that the product was being shipped to the U.S. and not China.

In 1983, Inder Chawla attempted to obtain Cross Pens by having Vachi Melwani of Doulatram and/or Andrew Wong falsely represent to the authorized distributor that the pens were destined for export to Nigeria. There is no evidence, however, that the Defendants succeeded in this fraudulent scheme. In January 1984, Sona received a letter from one of their distributors suggesting that it would try to ship the contracted goods through Sri Lanka or Mazambique and then to Miami in order to avoid detection.

Defendants admitted through a joint pretrial stipulation that they purchased the pharmaceuticals for resale in the U.S., that they acquired these pharmaceuticals at prices significantly below the U.S. wholesale price, they knew Mr. Lin obtained these pharmaceuticals against the resale policies of J & J, because J & J was not aware that the pharmaceuticals were intended for resale back to the U.S., and that had they known that neither Mr. Lin nor the Defendants ever really contemplated resale in China, they would have never approved the sale.

Mr. Lin testified under oath that he participated in the fraudulent scheme by representing that he falsely and fraudulently told J & J that the Defendants purchased these pharmaceuticals for resale into China. Lin also testified that he knew the pharmaceuticals were destined for resale in the U.S., and that he was instructed by Mr. Inder Chawla, who is an officer, director and shareholder of both defendant corporations, to make these false representations in order to accomplish the intended resale.

The Defendants denied that they either knew of these false representations, or that they prompted Mr. Lin to make these statements. Essentially, like Sergeant Schultz,[1] they claimed to have neither known, seen, nor participated in anything that would even remotely implicate improper conduct on their part. The Defendants denied giving any instructions to Mr. Lin that prompted the making of false representations as to the intended destination of these American manufactured pharmaceuticals. Furthermore, as good faith purchasers for value, even had Mr. Chawla participated in

---

**1.** No matter how many times this Court reviews the factual essence of this case, one cannot resist a comparison between the Defendants' professed ignorance of unlawful conduct, and perhaps the most memorable refrain of *Hogan's Heroes,* a popular television situation comedy of the 1960's. For those too young to remember, each episode featured a scene in which Sergeant Schultz, always unmindful of the clandestine activities of the irrepressible Colonel Hogan and his men, would be found to explain away his incompetence to his superior, the irascible Colonel Klink, by saying, "I know *n-oth-i-n-g,* I see *n-oth-i-n-g,* I do *n-oth-i-n-g."* This dialogue, which each week delighted television viewers across the country, somehow resurfaced once again, this time in my courtroom.

this fraudulent scheme, his action was taken on behalf of Elmcrest only, without any affiliation with Sona. At trial, however, the Defendants stipulated that the Defendants were in fact single entities for all legal purposes.[2]

■ The case law in a common law fraud claim is well settled. In essence, the Plaintiffs are required to prove that the Defendant had committed a fraudulent misrepresentation. In doing so, they must show that (1) the defendants falsely represented a material fact; (2) that they knew, or should have known that the representation was false; (3) that the Defendants intended to induce the plaintiffs to act on the false representation; and (4) that the Plaintiffs were injured while acting in reliance on the false representations. *Banco Nacional de la Vivienda v. Cooper*, 680 F.2d 727, 730 (11th Cir.1982). The burden that the Plaintiffs were required to meet at trial would be satisfied by proving, by a preponderance of the evidence, that the Defendants knew that they had falsely misrepresented their true intentions for purchase and resale of the pharmaceuticals. *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1103 (11th Cir.1983). Moreover, this intent to defraud can be inferred from the circumstances. *Interair Services, Inc. v. Lewis*, 44 B.R. 899, 903 (Bankr.M.D.Fla. 1984).

This Court is convinced that; (1) Mr. Lin deliberately and intentionally represented to the Plaintiffs that the pharmaceuticals at issue were being purchased for resale in the People's Republic of China; that (2) Lin's representation as to destination came under the instruction of Inder Chawla; that (3) Lin's representation of destination was false when made and both Lin and the Defendants knew it to be false; that (4) the Defendants intended J & J to rely on the false representation; (5) that J & J did so rely on the false representation by agree-

ing to sell the pharmaceuticals at a substantial discount from the wholesale price.

There is little question that J & J would not have sold the pharmaceuticals at issue in this case at such discounted wholesale prices absent the false representations as to the intended destination of the goods. Despite Defendants' claims to the contrary, whether J & J should have known that the Defendants' representations were false, is legally immaterial. *See Banco Nacional*, 680 F.2d at 730. The fact remains that the Defendants sought to obtain pharmaceuticals at a price that they knew would not otherwise be available if they had properly disclosed the ultimate destination of the goods.

This Court finds that the Plaintiffs are entitled to compensatory damages in the amount of $325,257.31. In reaching this figure, the Court calculated the following: 1) a $200,290.30 loss for the sale of Retin-A; 2) a $88,160.77 loss for the sale of both Parafon Forte and Tolectin; and 3) a cost of $35,194.00 in disposing of some products, including $1,612.24 for transportation.

This Court has determined that in a case such as this, the theory of liability and consequent damage claim can hinge on either common law fraud *or* the applicable Florida Omnibus Thefts Statute, Fla.Stat. § 812.014. This Court has elected to use a common law fraud theory of liability, and therefore, no claim for treble damages will be available, although this Court will grant punitive damages.

■ Furthermore, this Court finds that the Defendants have engaged in similar conduct in their prior dealings with manufacturers in this country. It is precisely for this reason that punitive damages are necessary in order to properly deter future abuses of what should be the orderly administration of commercial business practices. It is hereby

---

**2.** This Court severely sanctioned Defendants' counsel, under Rule 11, for filing a baseless motion to dismiss grounded on lack of personal jurisdiction defense in claiming that Elmcrest Trading was beyond the jurisdiction of this Court. After extensive discovery, this Court de-

termined that the Defendants were single entities for all legal and factual purposes. *Ortho Pharmaceutical Corp. and Johnson & Johnson (Hong Kong) Ltd. v. Sona Distributors, Inc. and Elmcrest Trading, Ltd.*, Case No. 86–0032 (Feb. 12, 1987).

**68**

ORDERED AND ADJUDGED that the Court finds in favor of the Plaintiffs and against the Defendants and awards compensatory damages in the total amount of $325,257.31 with prejudgment interest from the date of the filing of the complaint and punitive damages in the amount of $650,000.00. It is furthermore

ORDERED AND ADJUDGED that the Plaintiffs are directed to file with this Court within (10) ten days from the signing of this Order, affidavits and supporting memoranda on the Plaintiffs' claim for attorneys' fees, costs, and the Plaintiffs' claim to $11,668.93 incurred actual costs for investigating and uncovering the fraud. The Defendants will have (10) ten days to respond, with (5) five days for Plaintiff to reply. Thereafter, the Plaintiffs will be asked to submit an order for a Final Judgment.