**BOWDOIN CONSTRUCTION CORPORATION,**
Plaintiff,

v.

**RHODE ISLAND HOSPITAL TRUST NATIONAL BANK, N.A.; James A. McBride; Raymond J. Sicard, Jr.; The First National Bank of Boston; Jared H. Ward; Guilliam Aaertsen; Bernard T. West; John Sennot; Advest Bank; Laurel–Sea Crest Realty Sales Corp.; Eugene F. Marchand; Philip K. Ludwig; Milton M. Stevens; Robert M. Dombroff; Mitchell Jaffe; Schatz & Schatz; Ribicoff & Katkin; Michael A. Silverstein; Hinckley, Allen, Snyder & Comen; Marvin N. Geller; and Brown, Rudnick, Freed & Gesmer, Defendants.**

Civ. A. No. 92–12338–PBS.

United States District Court,
D. Massachusetts.

Nov. 16, 1994.

Edwin A. McCabe, Perkins, Smith & Cohen, Boston, MA, Joseph P. Davis, III, The McCabe Group, Cambridge, MA, for Bowdoin Const. Corp.

Joseph L. Kociubes, Stephanie A. Kelly, Bingham, Dana & Gould, Boston, MA, for Rhode Island Hosp. Trust Nat. Bank, James A. McBride, Raymond J. Sicard, Jr., The First Nat. Bank of Boston, Jared H. Ward, Guilliam Aaertsen.

Walter B. Prince, Deborah A. Tootalian, Peckham, Lobel, Casey, Prince & Tye, Boston, MA, for Bernard West.

Katherine E. Perrelli, James L. Ackerman, Anne M. Ziebarth, Day, Berry & Howard, Boston, MA, for Advest Bank.

Thomas R. Murtagh, Jeffrey S. Robbins, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Boston, MA, for Robert M. Dombroff, Mitchell Jaffe, Schatz & Schatz, Ribicoff & Kotkin.

Jerome P. Facher, Andrea J. Robinson, Gabrielle R. Wolohojian, Hale & Dorr, Boston, MA, for Michael Silverstein, Hinckley, Allen, Snyder & Comen, Marvin N. Geller, Brown, Rudnick, Freed & Gesmer.

John B. Street, Jr., pro se.

## MEMORANDUM OF DECISION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS

SARIS, District Judge.

### INTRODUCTION

This case arises out of the financing of renovations at the Sea Crest Oceanfront Resort and Conference Center ("the Sea Crest") on Cape Cod.[1] The general contractor, Bowdoin Construction Corp. ("Bowdoin"), which was hired to conduct the renovation of the Sea Crest, brings this action against twenty-one defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(b) and (c), and state common law. Before the Court are six motions to dismiss, which the Court **ALLOWS** after hearing, with respect to the RICO claims only. Pursuant to 28 U.S.C. § 1367(c) the remaining state law claims are dismissed without prejudice.

### BACKGROUND

#### 1. Procedural Posture

Plaintiff has brought this action against the following defendants:[2] (1) the developer, the Laurel–Sea Crest Realty Sales Corp. (Laurel), and its officers, Eugene F. Marchand, Philip K. Ludwig, and Milton M. Stevens; (2) the lead lender, Rhode Island Hospital Trust National Bank (RIHT), its present parent company, the First National Bank of Boston, and their respective officers, James A. McBride and Raymond J. Sicard Jr. of RIHT, Guilliam Aaertsen and Jared H. Ward of Bank of Boston; (3) one supporting lender, Advest Bank; (4) the officers of the other supporting lender, Bernard West and John Sennot of Coolidge Bank. (5) the lawyer for the developer, Marvin N. Geller, with the firm Brown, Rudnick, Freed & Gesmer who was also the clerk of Laurel; (6) the lawyer for RIHT and Bank of Boston, Michael A. Silverstein with the firm Hinckley, Allen, Snyder & Comen; (7) the lawyer for Coolidge Bank, John B. Street Jr.; and (8) the lawyer for Advest Bank, Robert M. Dombroff and Mitchell Jaffe, with the firm Schatz & Schatz, Ribicoff & Katkin. Charges have been dismissed against Coolidge Bank's lawyer, John Street. There is no motion to dismiss from Laurel and its officers. Further, Sennot, an officer of Coolidge, was never served.

#### 2. Standard of Review

In ruling on a motion to dismiss for failure to state a claim, the Court must take all well-pled allegations as true, drawing all reasonable inferences in the plaintiff's favor. *See, e.g., Feinstein v. RTC*, 942 F.2d 34, 37 (1st Cir.1991) (citing cases). Due to the potency of RICO allegations, "particular care is required to balance the liberality of the Civil Rules with the necessity of preventing abusive or vexatious treatment of defendants." *Miranda v. Ponce Federal Bank*, 948 F.2d 41, 44 (1st Cir.1991) (discussing statement of civil RICO claims). This Circuit has admonished that "courts should strive to flush out frivolous [civil] RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir.1990).

---

1. It is one of four hard-fought federal cases. Two other cases were brought by investors. *See Schultz v. Rhode Island Hospital Trust National Bank*, CA No. 88–2870–JLT; *Allenby v. Rhode Island Hospital Trust National Bank*, CA No. 90–10850–K. The adversary proceeding pending in Bankruptcy Court is *Chrysler First v. Schultz*, 94–11127–PBS.

2. Count One (breach of contract—Laurel); Count Two (breach of contract—RIHT); Count Three (breach of covenants of good faith and fair dealing—Laurel and RIHT); Count Four (RICO—18 U.S.C. § 1962(b)—RIHT, Laurel, Marchand, Ludwig and Stevens); Count Five (RICO—§ 1962(c)—all defendants); Count Six (RICO—§ 1962(d)—all defendants); Count Seven (decl. judgment 28 U.S.C. § 2201(a); Mass. Gen.L. ch. 231A—Laurel, RIHT, Advest, Geller, Brown, Rudnick, Marchand, Ludwig and Stevens).

### 3. *The Allegations*

The alleged facts in the 114–paragraph complaint, much abbreviated, are as follows.

The Sea Crest is a resort on Cape Cod in Falmouth, Massachusetts. Marchand, the president of Laurel and a successful developer of resort properties, decided to purchase the hotel. In September 1986, Laurel began seeking financing to purchase and refinance the Sea Crest.

Laurel attempted to raise funds through the sale of federally registered securities. On September 12, 1986, Laurel filed a Registration Statement with the Securities and Exchange Commission, which was amended at least twice. On November 14, 1986, RIHT issued a formal commitment letter for a $7 million loan, subject to the conditions that the minimum subscription level ("MSL") be increased, and that the needed equity in the project be 66 percent of the total cost. The second amended registration statement reflected RIHT's lending requirements. Under the amended Registration Statement, Laurel was permitted to make a public offering of 266 hotel interests (rooms) in the Sea Crest resort, on the condition that it obtain a MSL of 80 rooms within 60 days, by April 10, 1987. Before Laurel could obtain the proceeds of the loan from the bank and retain an investor's funds, it had to meet the MSL.

In fact, although it acquired the Sea Crest as scheduled, Laurel never approached the MSL by the appointed date. Because of difficulties in selling units, RIHT gave Laurel a bridge loan of 1.3 million. After restructuring the project's financing through "sham sales", secret discounts, and other undisclosed financing methods, like high interest bridge loans, Laurel proceeded with the public offering in violation of its own terms— and without the knowledge of Bowdoin or investors. In February 1987, RIHT, which had been acquired by the Bank of Boston holding company, proposed to restructure its commitment by leading a loan of $18.3 million under a financing agreement which lowered the MSL and equity requirements, and increased the fee. Under the agreement, RIHT controlled the hotel interest sales escrow account from which its fees would ultimately be taken, and set the creditworthiness standards of mortgagors and purchasers. By April, 1987, Coolidge, Advest and Eliot had agreed to participate in the loan. Hinckley Allen acted as counsel to RIHT in connection with the loan. The loan was to close on April 10, 1987.

Plaintiff was told, throughout the winter and early spring of 1987, in meetings with Laurel's executives and with its attorney, Geller, that RIHT was the source of renovation financing, and that the MSL would be, and had been, met. On February 4, 1987, RIHT confirmed the bank's involvement in the financing of the acquisition and renovations. This was a false statement as the bank's loan was not supposed to be for renovation, just for acquisition. The actual cost of renovation could only be paid through the sale of units. On March 4, 1987, Laurel issued another prospectus which failed to disclose the risky financing. Geller was listed as Laurel's secretary, and Brown, Rudnick as counsel. On March 30, 1987, RIHT issued a new commitment letter, knowing that the enhanced risk to investors had not been disclosed. Laurel and RIHT—actively aided and abetted by Coolidge Bank and Advest—made a decision to lie to Bowdoin about the failure to meet the MSL. With knowledge of the deception, Coolidge and Advest contributed their share of the loan proceeds. Although attorneys Silverstein and Geller were aware of the failure to meet the MSL, they allowed the loan to go forward and permitted Laurel to disburse investor funds. In order to met the April 10 deadline, Geller, Brown, Rudnick and RIHT assisted Laurel in making sham deals.

On May 7, 1987, Laurel executed a letter of intent with Bowdoin to serve as the general contractor. On the understanding that Laurel would abide by the MSL condition, and that RIHT would finance the renovation project, on October 1, 1987, Bowdoin contracted to do an extensive renovation of the resort. Laurel assigned its contract with Bowdoin to RIHT which reviewed Bowdoin's work and approved all changes.

By September 30, 1987, Laurel was out of money and ceased paying Bowdoin. Without Bowdoin's knowledge, on October 1, 1987

RIHT placed the loan on its list of troubled loans. On December 15, 1987, RIHT falsely told Bowdoin that additional financing was in place. On December 21, 1987, upon the advice and instructions of Bank of Boston, RIHT refused to provide the additional financing. No one told Bowdoin. By January 10, 1988, at which point Bowdoin at last ceased work, it had incurred unreimbursed expenses of approximately one million dollars. On July 6, 1988, it filed, in state court, a claim for breach of contract and enforcement of a mechanic's lien claiming that Laurel owed it $1,075,290 exclusive of interest.

In September of 1988, the banks, with the assistance of all other defendants, put together a second restructuring plan to "rescue" the Sea Crest hotel. To pull it off, however, it was necessary first to ensure that the failure to comply with the MSL was not brought to light by plaintiff in state court. Laurel and Geller offered to pay plaintiff $153,000 if it would dismiss its action and sign a release of all legal claims. Geller claimed that Bowdoin's lien was subordinate to the Bank's security interest, and Bowdoin had no hope of recovery. Plaintiff agreed, on the theory that it would have no chance of recovering any money if Laurel entered bankruptcy—then unaware of the false claim that Laurel had met the MSL. On September 28, 1988, Coolidge Bank purchased RIHT's interest in the Sea Crest as of October 3, 1988. The release was signed on September 30, 1988.

Plaintiff initiated this lawsuit on September 28, 1992, just under four years after it was persuaded to dismiss its state action. It charges Laurel and RIHT with several state contract law offenses, and asks for a declaration that the release it signed at Laurel's request is void. But, most importantly, it accuses all defendants of violating the Racketeer Influenced and Corrupt Organizations

Act (RICO), in a variety of ways. The first four sets of defendants are charged with violations of 18 U.S.C. § 1962(b). All defendants are charged with violations of 18 U.S.C. § 1962(c), and of 18 U.S.C. § 1962(d).[3] As predicate acts, plaintiff alleges securities fraud, and the use of interstate mail and wire lines in violation of 18 U.S.C. §§ 1341 & 1343, of which it lists 103 specific examples.

Jurisdiction is claimed under 28 U.S.C. § 1331 for the RICO allegations, and on the theory of pendent jurisdiction for state law allegations.

### DISCUSSION

1. *The Effect of Recent Court Case Law*

During the pendency of this action, the Supreme Court has handed down two cases on point.

■ In *Central Bank of Denver v. First Interstate Bank of Denver,* ("*Central Denver*") the Court held that, under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), a private plaintiff may not maintain an action against those who do not engage in a manipulative or deceptive practice in violation of the securities laws but who aid and abet the violation. —— U.S. ——, ——, ——, 114 S.Ct. 1439, 1443, 1448, 128 L.Ed.2d 119 (1994). Defendants argue that, in light of *Central Denver,* aiding and abetting securities fraud cannot be a predicate act for RICO purposes, *i.e.,* that it cannot constitute "fraud in the sale of securities" under 18 U.S.C. § 1961(1)(D). Judge Tauro, in a companion case, has recently endorsed this theory. *See Schultz v. Rhode Island Hospital Trust National Bank,* Memorandum and Order at 6, 10, 1994 WL 326376 (May 24, 1994) (concluding, in part on the basis of *Central Bank of Denver,* that complaint contained no valid allegations of fraud

---

**3.** Section 1962(b) states:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(c) states:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Section 1962(d) prohibits conspiring to violate section 1962(b) and/or section 1962(c).

to underpin predicate acts of racketeering). This Court agrees that any allegations of aiding and abetting securities fraud cannot constitute predicate acts under RICO. To hold otherwise would enable plaintiffs to use RICO to circumvent the interpreted intent of the Securities Act—a result this circuit does not encourage. *See New England Data Services v. Becher,* 829 F.2d 286, 291 (1st Cir. 1987) ("[W]e certainly do not intend to create two bodies of law by making it easier to bring a charge of racketeering than securities fraud.") It follows that, with regard to all defendants except Laurel itself, Bowdoin has stated a claim only if its allegations of mail and wire fraud pursuant to 18 U.S.C. § 1341 and 1343 alone are legally sufficient to bear the weight of its RICO charges.

■ The second recent decision, *Reves v. Ernst & Young* ("*Reves*"), held that, to be found liable under 18 U.S.C. § 1962(c), a defendant "must participate in the operation or management of the enterprise itself." —— U.S. ——, ——, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). "Of course, the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly' makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required." *Id.* at ——, 113 S.Ct. at 1170. The Supreme Court rejected a requirement of "significant control over or within the enterprise." *Id.* at —— n. 4, 113 S.Ct. at 1170 n. 4. An enterprise also may be "operated" or "managed" by others "associated with" the enterprise, who exert control over it. *Id.* at ——, 113 S.Ct. at 1173 (rejecting argument that accounting firm participated in the management of the enterprise by failure to state in audit reports that a plant should be given its fair market value); *see also United States v. Weiner,* 3 F.3d 17, 24 (1st Cir.1993) (approving jury instruction based on *Reves* ).

■ Although *Reves* itself involved accountants, the case is written in terms that would apply to any outsider who does not direct an enterprise's affairs, and has already been applied to preclude a RICO suit against attorneys. *See Morin v. Trupin,* 832 F.Supp. 93, 98 (S.D.N.Y.1993) ("Even if this Court found that 'these defendants [attorneys] had substantial persuasive power to induce management to take certain actions', this is still not equivalent to having power 'to conduct or participate directly or indirectly in the affairs of those corporations.'") Under the "operation and management" test, plaintiff has made sufficient allegations against Laurel, Laurel's executives, and RIHT. *See* Complaint ¶¶ 39, 98 (alleging that RIHT exercised "actual control" over Laurel and Sea Crest).

■ With respect to two law firms, Plaintiff explains his theory of liability: "The two law firms against which RICO claims have been asserted represented the lead bank and participating bank in the loan. The liability of the latter is based upon allegations to the effect that, with full knowledge of the fraud being perpetrated, the law firms counselled their respective clients to continue to participate in the fraudulent transactions and to keep them hidden from the victims of the fraud, including Bowdoin." Docket 85, p. 6, no. 4. This claim is insufficient as a matter of law under the *Reves* test.

■ With respect to Advest and Coolidge, there is no allegation that they did anything but participate in a loan by RIHT to Sea Crest, knowing of the fraud. There is no allegation they participated in the control or management of Sea Crest. This role is more akin to the outsider in *Reves,* held not to be liable under section 1962(c).

■ With respect to Bank of Boston, its holding company acquired RIHT, and it was giving advice and instructions regarding the loan. *See* Complaint ¶¶ 38, 63. By 1988, complaint alleges that the Bank of Boston took a much more active role in dealing with the loan. However, unlike the allegation of direct control by RIHT over the enterprise, the complaint does not allege that the Bank of Boston participated in the operation or control of Sea Crest.

■ Geller and Brown, Rudnick present a somewhat closer question because Geller served as a clerk and secretary of Laurel. However, as there are no allegations that he

participated in the operation or management of the Sea Crest, the alleged enterprise, or that he did anything other than provide legal advice and legal services, the RICO claim must be dismissed. *See Biofeedtrac Inc. v. Kolinor Optical Enterprises of Consultants, S.R.L.,* 832 F.Supp. 585, 591 (E.D.N.Y.1993) ("Corporate counsel customarily fill such roles [corporate secretary and sole director] without becoming a part of the operation or management of the enterprise.")

Because with respect to all defendants other than Laurel and RIHT, plaintiff relies exclusively on an aiding and abetting theory (*see* Complaint ¶¶ 84–87), on the basis of *Reves,* Count V, alleging violations of section 1962(c), must be dismissed as to all defendants other than the Laurel defendants and RIHT.

### 2. *Pattern*

■ Plaintiff alleges a pattern of racketeering activity from early 1987[4] through September 30, 1988. All RICO violations must be predicated on a "pattern of racketeering activity." 18 U.S.C. § 1961(5). A group of predicate acts constitute a "pattern of racketeering activity" within the meaning of RICO when they "are related, *and* ... they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989) ("*HJ* ") (emphasis in original). Since no party has questioned that the acts alleged here are related, and that they do not pose a *threat* of continued criminal activity, the inquiry focuses on whether they, in themselves, amounted to continued criminal activity.

■ In this circuit, this Court must continue to take into account the six "Morgan" factors, first enumerated by the Seventh Circuit: "(1) 'the number [of predicate acts]; (2) the variety of predicate acts; (3) the length of time over which they were committed; (4) the number of victims; (5) the presence of

separate schemes; and (6) the occurrence of distinct injuries.' " *Fleet Credit Corp. v. Sion,* 893 F.2d 441, 446 (1st Cir.1990) (citation omitted). The most recent Supreme Court case on the subject has been understood not to override these factors, but merely to signal that special emphasis should be put on the first and third factors, *i.e.,* on the number and duration of the predicate acts. *Id.* at 446–47 (interpreting *H.J., supra* ).

■ Plaintiff has failed to prove the requisite racketeering pattern. This is so even in the extreme case of Laurel, the only defendant that could conceivably be held responsible for securities law offenses in light of *Central Denver.* Plaintiff has alleged that Laurel: (1) violated the terms of the Sea Crest public offering; and (2) covered its tracks, with the help of the other defendants. The cover-up, which lasted at least 18 months, was itself two-fold. Defendants continually hid from plaintiff: (a) the fact that the public offering's terms had not been met; and (b) the fact that the project's financing had been restructured accordingly. Certain misrepresentations (by RIHT and Laurel) have been alleged with specificity, most notably the misrepresentation that the MSL had been met and that financing for the renovations was in place. In addition, 103 alleged instances of mail and wire fraud are listed, all relating to various phases of loan restructuring. The only victim, so far as this litigation is concerned, was the plaintiff, though 2 distinct injuries arguably were suffered—one when plaintiff incurred construction costs in reliance on defendants' misrepresentations, and a second when plaintiff was persuaded, under false pretenses, to forfeit its chance for full legal recovery.

It has long been settled in the First Circuit that, in civil RICO cases, an act "is not transformed into the threatening 'pattern of racketeering activity' with which Congress was concerned simply because [it] is imple-

---

**4.** The complaint states April 25, 1986 but the significance of this date is obscure, and it cannot be accepted as a starting point for the conspiracy in light of the statement of facts which suggests that Laurel did not even seek financing until September 1986 or acquire the Sea Crest, the enterprise, until April 1987. Even assuming that predicate acts may transpire prior to acquisition of the enterprise, the earliest starting point consistent with the complaint would be about January 1, 1987, when it is alleged that Laurel began to anticipate some trouble meeting the MSL. *See* Complaint ¶ 33.

mented in several steps and involves a number of acts of communication. This is especially true when the acts involve mail and wire fraud. 'In today's integrated economy, it is the rare transaction that does not somehow rely on extensive use of the mails or the telephone.'" *Roeder v. Alpha Industries, Inc.*, 814 F.2d 22, 31 (1st Cir.1987) (citations omitted). Numerous district court cases in this circuit have applied this lesson, finding no racketeering pattern where all of the alleged acts or communications related to a unitary goal and a single episode of fraud. *See, e.g., Johnson v. Andrews*, 1994 WL 455013 at *3 (D.Mass.1994); *National Credit Union Admin. Bd. v. Regine*, 749 F.Supp. 401, 407 (D.R.I.1990); *Trundy v. Strumsky*, 729 F.Supp. 178, 184 (D.Mass.), *aff'd*, 915 F.2d 1557 (1st Cir.1990); *Framingham Union Hosp., Inc. v. Travelers Ins. Co.*, 721 F.Supp. 1478, 1484 (D.Mass.1989); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 721 F.Supp. 15, 16 (D.Mass.1989), *aff'd on other grounds*, 904 F.2d 786 (1st Cir.), *cert. denied*, 498 U.S. 992, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *But see Laker v. Freid*, 854 F.Supp. 923, 930 (D.Mass.1994) (predicate acts extended over a period of 37 months and the transactions could be considered distinct episodes because they were widely spaced and they involved different sums and loan participation terms).

Most importantly, the First Circuit has reaffirmed the reasoning of *Roeder* in the post-*H.J.* era, in an opinion by Justice (then Chief Judge) Breyer, dismissing a complaint making allegations at least as extensive as the plaintiff's. The court was faced with "several instances of criminal behavior—a bribe, several false statements, a cover-up, and (possibly unlawful) access to confidential information But these events all took place over a comparatively short period of time"—less than two years. "Taken together," the court concluded, these instances comprised "a single effort to obtain (and to keep) one $96 million Defense Department contract. Thus, they ... are appropriately characterized as separate parts of a single criminal episode." *Apparel Art Internat'l, Inc. v. Jacobson*, 967 F.2d 720, 723 (1st Cir.1992) (citations omitted). Justice Breyer analogized these allegations to a single, complex inter-

state bank robbery, as opposed to a string of robberies. A bank robbery may consist "of several different parts (say, using a gun, threatening a teller, stealing a getaway car, perhaps abducting the teller as well, and eventually lying about participation). Some of these separate parts may themselves constitute separate criminal acts.... Yet those several separate criminal parts, taken together, do not generally make out a 'pattern.' To hold otherwise would mean that many individual bank robberies, frauds, drug sales, embezzlements, and other crimes as well would automatically fall within the scope of the RICO statute, a result contrary to RICO's basic purpose." *Id.* at 722 (citations omitted).

The allegations in this case, too, resemble the single complex robbery more than they do the larceny spree. All alleged acts revolve around the perpetration and concealment of an allegedly fraudulent arrangement for the renovation of the Sea Crest hotel. Plaintiff has not alleged a racketeering pattern in satisfaction of the RICO statutes.

### 3. Conspiracy

The last RICO count—alleging a section 1962(d) conspiracy—topples in consequence. *See Flinders v. Datasec Corp.*, 742 F.Supp. 929, 934 n. 10 (E.D.Va.1990) (noting that the "absence of [a] pattern [is] as fatal to the conspiracy claim as it [is] to the substantive claims, for without a RICO pattern, there [can] be no agreement to violate RICO") (citing cases).

### 4. Declaratory Judgment

The request for declaratory relief must be dismissed because in order to issue a declaratory judgment, the complaint must allege "actual controversy" within the federal court's jurisdiction. 28 U.S.C. § 2201(a); Mass.Gen.Laws ch. 231A, § 1. The state claim against Laurel, RIHT, Advest, Geller, Brown, Rudnick, Marchand, Ludwig and Stevens as to the validity of the release signed on September 30, 1988 will be dismissed without prejudice.

### 5. Pendent Claims

As this Court has determined that plaintiff has failed to state a RICO claim against any

**1012**

defendants under 18 U.S.C. § 1961, it need not address the numerous other arguments raised by each defendant. Pursuant to 28 U.S.C. § 1367(c), where the supporting federal claims have been dismissed, the Court has discretion to dismiss the pendent state claims as well, without prejudice to a future state court action. *See, e.g., United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Figueroa Ruiz,* 896 F.2d at 650; *Fleet Credit,* 893 F.2d at 448.

### *ORDER*

Counts IV, V and VI, alleging violations under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq., are ***DISMISSED*** as to all defendants for failure to state a claim. The claim for federal declaratory relief in Count VII is dismissed for lack of an actual federal controversy. The claim for state declaratory relief in Count VII, and the remaining state claims, Counts I, II and III, are dismissed without prejudice.