# GTE Products Corporation *vs.* Broadway Electrical Supply Co., Inc., & others.[1]

No. 95-P-1983.

Middlesex. December 17, 1996. - March 6, 1997.

Present: Porada, Kaplan, & Ireland, JJ.

*Fraud. Practice, Civil,* Damages, Instructions to jury. *Agency,* Agent's duty of fidelity, Scope of authority or employment. *Consumer Protection Act,* Damages. *Contract,* Termination, Performance and breach. *Unfair Competition. Racketeer Influenced and Corrupt Organization Act.*

In an action based on a contract, alleging fraudulent misrepresentation, the judge properly excluded the defendant's proffered evidence on the issue of the plaintiff's damages and properly instructed the jury on the measure of damages, the plaintiff's expected benefit of the bargain. [295-297]

In a civil action, the judge did not err in allowing the plaintiff's postverdict motion to establish the damages as the amount the plaintiff had proved, where the defendant had produced no evidence before or during trial to establish otherwise. [297-298]

Evidence at the trial of a fraud claim was sufficient to support the determination of the jury that the plaintiff's agent's participation with the defendant in the fraudulent scheme was independent and against his employer's interest so that any knowledge of the agent was not properly attributable to his principal, the plaintiff, and the judge's instructions to the jury on the issue were correct. [298-300]

There was no error in a judge's decision in favor of the plaintiff's claim under G. L. c. 93A. [300-301]

The judge in a civil action correctly entered summary judgment for the plaintiff on the defendants' breach of contract counterclaim where he found that the plaintiff had properly terminated the agreement in question "for cause" as provided in its own terms. [301]

In a civil action, the defendants' antitrust and G. L. c. 93A counterclaims were lacking factual support and the judge properly dismissed the defendants' counterclaims on summary judgment. [301-302]

In a civil action the judge correctly denied the defendants' motions for a

[1]Eduardo Mariani, Gloria Rosenthal, Mark Rosenthal, and Marvin Rosenthal. Mariani and Mark Rosenthal are current officers of Broadway Electrical Supply, Inc. Marvin Rosenthal (Mark's father) is Broadway's founder and a current consultant to the corporation. Gloria Rosenthal is a defendant on a personal guaranty only.

directed verdict on the plaintiff's claims under the Racketeer Influenced Corrupt Organizations Act, where the jury could reasonably have concluded from the evidence that there were numerous distinct episodes of fraud carried out over a lengthy period of time. [302-303]

CIVIL ACTION commenced in the Superior Court Department on December 23, 1991.

The case was tried before *George A. O'Toole, Jr.,* J.

*Jeffrey A. Gorlick* for the defendants.

*Joseph D. Steinfield* (*Peter E. Ball* with him) for the plaintiff.

IRELAND, J. The defendants, distributors of electrical supplies from their place of business in Lawrence, fraudulently obtained discounted prices on lightbulbs manufactured by the plaintiff. The defendants accomplished this for eight years through a sham business entity known as Glomar, Inc. (Glomar), which they created in 1983.[2] From 1983, when the plaintiff first agreed to supply lightbulbs to the defendants for resale, until 1991, when the defendants' scheme finally unraveled and the plaintiff terminated the agreement, the defendants regularly submitted claims to the plaintiff for special price breaks called "end user" discounts. The claims identified Glomar as a customer of the defendants' business and as the buyer or "end user" of the lightbulbs. The defendants, by an elaborate ruse, defrauded the plaintiff, backing up their claims for the end user discounts with phony records that included order forms, checks, and receipts — all purporting to show that Glomar had actually purchased the lightbulbs from the defendants.

Instead, the defendants sold the lightbulbs to another distributor, who was not affiliated with the plaintiff, after first removing their business's name from the shipping cartons to prevent the plaintiff from tracing the lightbulbs back to the defendants. That distributor, in turn, resold the lightbulbs to the general public at prices substantially lower than those offered by the plaintiff's affiliated distributors. The defendants' scheme was carried out almost from the beginning with the knowledge of the plaintiff's sales representative who never informed the plaintiff of the fraudulent activity.

[2]The name was formed by combining portions of Gloria and Marvin Rosenthal's names.

After terminating the distribution agreement in 1991, the plaintiff sued the defendants for damages that included the difference of $312,394 between the regular undiscounted price of the lightbulbs and the end user discount price that the defendants had fraudulently obtained through the Glomar scheme between 1983 and 1991. All but a claim for damages under G. L. c. 93A (which the judge reserved to himself) were tried to a jury, which found the defendants Broadway Electrical Supply Co., Inc., and Marvin Rosenthal liable for common law fraud and the defendants Marvin Rosenthal, Mark Rosenthal, and Eduardo Mariani liable for violations of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 et seq. (1994). In a separate memorandum of decision, the judge found all of the defendants, except Gloria Rosenthal, liable on the c. 93A claim.

The ensuing judgment from which the defendants appeal awards the plaintiff substantial compensatory, punitive, and other damages. These include $312,394, plus interest, in compensatory damages on the fraud count; $2,186,758, plus interest, attorneys fees, and costs in compensatory and punitive damages on the c. 93A claim assessed by the judge; and $937,182 in punitive damages on the RICO claim.[3] We turn to the defendants' claims of error, reciting additional facts where needed.

1. *Assessment of damages.* According to the defendants, the plaintiff suffered no out-of-pocket losses as a result of their fraudulent acts: the plaintiff still made money on the discounted sales. Hence, the only possible claim for damages was the plaintiff's expected benefit between 1983 and 1991 from its bargain with the defendants. The defendants hoped to show that that bargain, in fact, was worth little more than what the plaintiff had already actually received. The defendants' cleverly crafted legerdemain on the point can be boiled down and put more baldly: if unable to cheat to obtain discounts, they claim they may not have performed the agreement in the first place. Accordingly, they sought to elicit evi-

---

[3]The judgment also assesses damages according to jurors' answers to other special jury questions: $22,086, plus interest, against the defendant corporation for goods sold and delivered by the plaintiff; $8,169, plus interest (also against the corporation) for breach of a business partnership and loan agreement; and $30,175, plus interest, against the defendants Marvin and Gloria Rosenthal for breach of a guaranty agreement.

dence at trial that, had the end user discounts not been given, they likely would have purchased far fewer, or even none, of the plaintiff's lightbulbs. The judge, however, allowed, over the defendants' objections, the plaintiff's motion in limine to exclude all evidence or argument whether the defendants would have purchased lightbulbs without the price discounts. The judge's jury instructions on damages, to which the defendants also objected, relied essentially upon the same reasons used to exclude evidence that the plaintiff's bargain was worth substantially less than claimed. The judge instructed the jury that the proper measure of damages in the case (if any there were) would be the plaintiff's expected benefit of the bargain, seen as the difference between the undiscounted or full price of the lightbulbs and the fraudulently obtained end user price. There was no error either in excluding the defendants' proffered evidence or in instructing the jury on the measure of damages.

The general rule on damages in cases like this of intentional (versus negligent) misrepresentation is that the plaintiff is entitled to the benefit of his bargain or "the difference between the value of what he has received and the actual value of what he would have received if the representations had been true." *Rice* v. *Price*, 340 Mass. 502, 507 (1960). Where, as here, benefit of the bargain damages "are proved with reasonable certainty, that rule will be employed." *Id.* at 510, quoting from Prosser, Torts § 91, at 570 (2d ed. 1955). See Restatement (Second) of Torts § 549(2) (1977) (applying benefit of bargain recovery to parties in business transactions where damages are proved with reasonable certainty); Nolan & Sartorio, Tort Law § 146 (2d ed. 1989). These principles are easily applied to the matter at hand. The defendants knowingly misrepresented to the plaintiff that Glomar was a genuine end user. Had they told the plaintiff the truth about Glomar, they would not have received end user discounts and would, instead, have paid undiscounted prices. The defendants wish to substitute the surmise and guesswork of calculating how many, if any, undiscounted lightbulbs they might have purchased from the plaintiff in the place of the near mathematical precision with which the plaintiff established its benefit of bargain damages.

In cases like this of fraudulently obtained price breaks, other courts have not hesitated to award manufacturer-

suppliers the difference between a fraud-induced price and the regular price. See *Ortho Pharmaceutical Corp.* v. *Sona Distrib., Inc.*, 663 F. Supp. 64, 66-67 (S.D. Fla. 1987); *Shulton, Inc.* v. *Optel Corp.*, 698 F. Supp. 61, 63-64 (D.N.J. 1988). The defendants attempt to hide from those cases and, instead, seize upon a tiny portion of lengthy dictum in *Ash* v. *Wallenmeyer*, 879 F.2d 272, 275 (7th Cir. 1989), to the effect that, on remand, the defendants would be allowed to try to prove they would have purchased fewer shipment services from the plaintiff at the full tariff rate than they did at the lower rate fraudulently charged by the plaintiff's unfaithful agent. We find the point unpersuasive. In *Ash*, unlike here, it was the plaintiff's own employee — not a party like the defendant in an arm's length transaction with the plaintiff — who instigated and carried out the fraud. Here, by contrast, the defendants' acts were the driving force behind the fraud; the plaintiff's agent merely stood by and helped to facilitate the scheme. The situation here is on all fours with *Ortho Pharmaceutical, supra,* and *Shulton Inc., supra.* The approach to damages for fraud in those cases is consistent with the general rule in *Rice* v. *Price*, 340 Mass. at 507, that favors, where possible, an award of benefit of bargain damages to victims of fraudulent misrepresentation.

The defendants also claim error in allowance of the plaintiff's postverdict motion to increase the damages of $108,167 that the jury awarded on the fraud and RICO counts to $312,394 — the amount the plaintiff established through documentary evidence prior to and during trial as its benefit of bargain damages. For their part, the defendants produced no documentation prior to trial (or evidence at trial) that those damages were other than what the plaintiff claimed. Hence, the single question of damages on the two counts was ripe for summary judgment and need not have been submitted to the jury at all. The judge tacitly recognized that fact in comments he made at sidebar but, nonetheless, instructed the jury that damages on the fraud and RICO counts were the difference between the regular price and the total amount of end user discounts the plaintiff's records established for the entire eight-year period.[4]

The plaintiff's postverdict motion was in the nature of a

---

[4]When queried by the judge as to how they had arrived at the $108,167 figure, the jury answered that they had adopted their own formula.

belated motion for summary judgment on the question of benefit of bargain damages.[5] The defendants never established a genuine issue of fact on the correct amount, and, hence, the plaintiff was entitled to summary judgment on that one question (dependent, of course, upon the jury's finding of liability on the other elements of the fraud and RICO claims). There was no error in allowing the motion, even though the preferable course would have been for the plaintiff to submit its motion prior to trial. We affirm the $312,394 award on each of those claims.

2. *Unfaithful or adverse agent.* Bill Wasserman, the plaintiff's local sales representative, met in 1983 with the defendants Marvin Rosenthal, Mark Rosenthal, and Eduardo Mariani, who were then the principals of Broadway Electrical Supply, to help negotiate the distribution agreement. Shortly after the agreement took effect, Wasserman learned that Glomar — the entity the defendants had identified during the negotiations as the would-be buyer and end user of most of the lightbulbs the plaintiff was to supply — was not a valid corporate entity or business but was purely a creation of the defendants to be used by them to qualify for end user discounts. Wasserman (who apparently feared he would lose his job if the truth about Glomar came to light) and Marvin Rosenthal (for reasons more obvious) swore themselves to silence to keep the information about Glomar from the plaintiff. From that point, in 1983, to 1989, when he left the plaintiff's employ, Wasserman breathed not a word to his employer. Nor, of course, did Marvin or any of the other defendants, as they continued to chalk up phony discounts.

The defendants maintain that, with Wasserman's help, the plaintiff still realized a profit under the agreement, and, thus, his actions were not directly antagonistic or adverse to the plaintiff's interests. According to the defendants, Wasser-

---

[5]The defendants point out that the plaintiff filed no motion for a directed verdict and, hence, the plaintiff's postverdict motion cannot be regarded as one for judgment notwithstanding the verdict under Mass.R.Civ.P.50(b), 365 Mass. 814 (1974). See *Service Publications, Inc.* v. *Goverman*, 396 Mass. 567, 571 n.5 (1986) (filing of motion for directed verdict is prerequisite for filing of motion for judgment n.o.v.).

The defendants also point out that the plaintiff's motion cannot be treated as one for an additur pursuant to Mass.R.Civ.P. 59(a), 365 Mass. 827 (1974), since they were not given the opportunity to consent to a new trial in place of an additur.

man's agency was not sufficiently adverse to the interests of his principal such that his conduct or knowledge should not be imputed to the principal. See generally Restatement (Second) of Agency § 282(1) (1958), relied on by the defendants.

The issue of Wasserman's agency — like that concerning damages — was central to the defendants throughout the pretrial and trial proceedings. Simply put, they hoped to peg the plaintiff with Wasserman's knowledge of and complicity in the Glomar scheme so as to escape liability on the fraud, RICO, and c. 93A counts.[6] The central premise underlying the defendants' position that Wasserman's actions should be attributed to his principal is that the plaintiff still benefited from the fraud-induced sales; hence, Wasserman engaged not in an "independent" fraud but, instead, acted within the general scope of his employment to further his employer's interests. We cannot agree.

The question whether Wasserman acted on his own and against his employer's interests was one of fact for the jury to decide. Accordingly, the motions for directed verdict and judgment notwithstanding the verdict were both properly denied. Moreover, the judge correctly instructed the jury on the question of adverse agency. He stated, "The knowledge of a faithless agent is not imputed to the principal." He added that "[a]n agent conducting on his own a fraudulent scheme against the interest of his principal does not act for the principal." He then instructed the jury that they should *not* attribute Wasserman's knowledge to the plaintiff *if* they found: (1) that Wasserman had concealed knowledge from the plaintiff (a fact conceded by the defendants) *and* (2) that, in so doing, Wasserman had acted against the interests of the plaintiff.

The instruction correctly left the jury to determine the essential second point above that Wasserman's knowledge should *not* be imputed to his principal if he acted on his own adversely to the principal. See Restatement (Second) of Agency § 282; Seavey, Agency § 102 (1964). Indeed, in cases like this where the agent and a third party have colluded to

---

[6]According to the defendants, the uncontested evidence concerning Wasserman's actions entitled them to a directed verdict or to judgment notwithstanding the verdict on each of those counts, based on Wasserman's knowledge of the scheme being imputed to the plaintiff.

defraud the principal, the agent's knowledge generally is *not* imputed to the principal. See *Union Old Lowell Natl. Bank* v. *Paine,* 318 Mass. 313, 323-324 (1945); Restatement (Second) of Agency § 282, illustrations 1, 2, and, especially, 5; Seavey, *supra* § 102, comment G, at 180 ("The clearest case for denying the principal's liability is that in which there has been collusion between the other party to a transaction and the agent").

The defendant's reliance upon *Kansallis Fin. Ltd.* v. *Fern,* 421 Mass. 659 (1996), is misplaced. *Kansallis* deals with the more typical case where an innocent third party has sued to impose liability upon a principal for the fraudulent acts of its agent. *Id.* at 660-661. The court held that, even where it is apparent to the third party that an agent lacks actual or apparent authority, liability may still be imposed if the agent's actions were intended in some way to benefit the principal. *Id.* at 670. The opinion indicates, at 667:

> "Since there is . . . some possibility that the [principal] will benefit from the errant [agent's] act, then as between two innocent parties it is not unfair that the one whom the wrongful act may have [benefited] and was meant to benefit must bear the burden of the harm."

The rationale for imputing an agent's knowledge to his principal in order to do justice to an innocent third party is totally lacking here. The only "innocent party" is the plaintiff, against whom its own agent and the defendants conspired. That the plaintiff may have benefited in some small way in spite of the agent's fraudulent acts is hardly enough to establish by a directed verdict standard that Wasserman's actions were not adverse to his employer's interests. There was countervailing evidence for the jury to consider on the question of adverse agency, including that Wasserman's actions were largely motivated by his personal desires to hold on to his job and to receive commissions on orders placed by the defendants. There was evidence, as well, that the defendants' resale scheme (in which Wasserman also acquiesced) substantially undermined the plaintiff's entire distribution and pricing system within the eastern Massachusetts area. In short, the jury could reasonably find from the evidence that Wasserman was an adverse agent.

3. *The G. L. c. 93A claim.* The defendants attack upon sev-

eral fronts the judge's memorandum of decision and resulting judgment on the c. 93A claim. First, they contend that the memorandum of decision — tracking nearly verbatim as it does the plaintiff's proposed memorandum — fails to evidence " 'a badge of personal analysis' by the trial judge." *Cormier* v. *Carty*, 381 Mass. 234, 237 (1980). As suggested in that case, we have examined the judge's memorandum with closer than usual scrutiny but can find therein no clearly erroneous findings of fact or flawed rulings of law.

The defendants' remaining claims against the c. 93A judgment, namely: (1) that the judge failed to mention in his decision that Wasserman was a knowing participant in the fraud whose knowledge should be imputed to the plaintiff; and (2) that the judge improperly calculated c. 93A damages based on his earlier ruling prior to trial to exclude all evidence that, without discounts, the defendants would have bought fewer lightbulbs, are little more than rehashes of other claims. We have already stated that evidence appeared at trial from which the jury (and the judge) could reasonably conclude that Wasserman's agency was adverse to the plaintiff's interests. Moreover, the judge properly excluded from the jury the defendants' proffered evidence on damages, and, therefore, he need not have considered that evidence in deciding the proper measure of damages in the c. 93A claim.

4. *Summary judgment dismissing the defendants' three counterclaims.* The defendants counterclaimed that the plaintiff breached the parties' distribution agreement. The defendants' opposition to the plaintiff's motion for summary judgment on this claim focused exclusively on the propriety of the plaintiff's termination of the agreement in 1991, once the phony Glomar scheme came to light. The motion judge correctly found that the plaintiff terminated the agreement "for cause" as provided under the terms of the agreement. Culpable behavior is "just cause" to terminate a contract. *Klein* v. *President & Fellows of Harvard College*, 25 Mass. App. Ct. 204, 209 (1987). The defendants' belated arguments concerning the plaintiff's pretermination conduct under the agreement were not addressed to the motion judge, and, therefore, we will not consider them on appeal. See *Manganaro Drywall, Inc.* v. *Penn-Simon Constr. Co.*, 357 Mass. 653, 659 (1970).

The defendants' second counterclaim alleging antitrust

violations of G. L. c. 93 by the plaintiff was also properly dismissed on summary judgment. The claim alleged no specific facts either that the plaintiff had conspired with other named parties to fix prices, or that the plaintiff's action terminating a single distributor had somehow substantially lessened competition or tended to create a monopoly within the electrical supply industry. The defendants (who bore the burden of proof on this claim) did not counter the plaintiff's affidavits and other materials accompanying the summary judgment motion with materials of their own tending to show triable issues of fact on this claim. See *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 711-712 (1991). By itself, parallel pricing behavior of the sort alleged by the defendants within a concentrated and competitive industry does not establish a conspiracy to fix prices. See *Theatre Enterprises, Inc.* v. *Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954). The defendants' assertion that the plaintiff had a general marketing philosophy of not beating its competitors' prices also does not make out an antitrust violation. Such practices by a manufacturer to meet — but not beat — competitors' prices do not violate Federal price discrimination law. *Falls City Indus., Inc.* v. *Vanco Bev., Inc.*, 460 U.S. 428, 446 (1983). The defendants' other allegations of antitrust violations were similarly lacking in factual support.

The defendants' c. 93A counterclaim relied exclusively for evidence of the plaintiff's unfair or deceptive business practices upon the allegations within the antitrust count, which the motion judge correctly concluded failed to set forth triable claims. The antitrust counterclaim was properly dismissed on summary judgment and so, too, therefore, was the c. 93A counterclaim.

5. *Evidence of RICO violations.* Finally, the defendants contend that their motions for a directed verdict on the RICO claims should have been allowed. No evidence, according to them, was presented of the two or more prerequisite crimes that are needed in order to establish civil liability under RICO. Nor, according to the defendants, was the "pattern" of racketeering activity required by RICO, 18 U.S.C. § 1961(5) (1994), shown by the evidence. As support, they cite *Bowdoin Constr. Corp.* v. *Rhode Island Hosp. Trust Natl. Bank*, 869 F. Supp. 1004, 1010-1011 (D. Mass. 1994) ("no racketeering pattern where all of the alleged acts or com-

munications relate[ ] to a *unitary goal and a single episode of fraud*"; emphasis supplied).

In essence, the *Bowdoin Constr. Corp.* case involved the use of interstate mail and wire services by a defendant in an ongoing cover-up of a single fraudulent scheme to induce the plaintiff into believing that plans to reconstruct a resort hotel were adequately financed. *Id.* at 1007. The court failed to find the required pattern of separate prerequisite crimes and, so, dismissed the civil RICO claims. *Id.* at 1011. At the core of the court's reasoning was the fact that the defendant's various acts "revolve[d] around the perpetration and concealment of an allegedly fraudulent arrangement . . . ." *Ibid.* By contrast, the individual claims that were submitted to the plaintiff for end user discounts under the Glomar scheme may fairly be seen as discrete episodes of fraud that were perpetrated over a lengthy period of time. At any time during the eight years, the defendants could simply have stopped submitting false claims to the plaintiff. Instead, they continued making individual false claims until they were caught. In short, the jury could reasonably have concluded from the evidence that the Glomar ruse was carried out, not as a single complex scheme, but as a string of individual fraudulent acts akin to a "larceny spree." 869 F. Supp. at 1011. See *Fleet Credit Corp.* v. *Sion,* 893 F.2d 441, 445-446 (1st Cir. 1990); *Laker* v. *Freid,* 854 F. Supp. 923, 930 (D. Mass. 1994) (numerous fraudulent loan transactions that occurred regularly over a thirty-seven-month period were considered distinct episodes for purpose of establishing RICO liability). Contrast *Apparel Art Intl., Inc.* v. *Jacobson,* 967 F.2d 720, 722-723 (1st Cir. 1992) (cited and discussed in *Bowdoin Constr. Corp., supra* at 1011). The motions for a directed verdict were properly denied.

*Judgment affirmed.*